**Margaret COLLIER Plaintiff,**

v.

**THE CLAYTON COUNTY COMMUNITY SERVICE BOARD, et al. Defendants.**

**No. CIV.A.1:00–CV–1547–J.**

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 30, 2002.

**1348**

David C. Ates, Miller Billip & Ates, Atlanta, GA, for Plaintiff.

Adam L. Appel and Kimberly N. Royal, Carlock Copeland Semier & Stair, Atlanta, GA, for Defendant.

## ORDER

CARNES, District Judge.

This case is before the Court on defendants' Motion for Summary Judgment [45]; defendants' Motion to Compel the Production of plaintiff's medical records [38–1]; defendants' Motion to File a Brief in Excess of Pages [44]; and plaintiff's Motion to File a Reply Brief in Excess of Pages [53–1]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendants' Motion for Summary Judgment [45] should be **GRANTED**; defendants' motion to compel the production of plaintiff's medical records [38–1] should be **DENIED AS MOOT**; defendants' motion to file a brief in excess of pages [44] should be **GRANTED**; and plaintiff's motion to exceed page limitation in responding to defendants' brief that exceeds the page limit [53–1] should be **GRANTED**.

## BACKGROUND

On June 11, 2000, plaintiff Margaret Collier ("Collier" or "plaintiff") filed suit against the defendants alleging various causes of action relating to race discrimination and retaliation pursuant to several federal statutes. Collier is an African–American woman who was formerly employed as the Associate Director of the Clayton County Community Service Center (the "Center"). She alleges that she was not appointed to the position of Interim Executive Director due to her race and was subsequently "constructively discharged" from her position at the Center on June 15, 2000. (Compl. [1] ¶ 1.) She alleges that her constructive discharge was the result of racial discrimination and retaliation for complaining about the racial composition of the Clayton County Community Service Board ("the Board," the "the Center Board," or "CCCSB"), for filing a charge with the Equal Employment Commission ("EEOC"), and for exercising her rights under the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*. The defendants in this action are the CCCSB, the CCCSB Chairman Bob Reynolds ("Reynolds"), CCCSB member A. Gene Gaissert ("Gaissert"), CCCSB member Mike McBroom ("McBroom"), CCCSB member Debbie Hibben ("Hibben"), and the individual appointed Interim Executive Director of the Center, Jimmy Wiggins ("Wiggins"), who, after the events at issue in this litigation, eventually became the permanent Executive Director.

Unless otherwise indicated, the Court draws the undisputed facts from "Defendants' Statement of Undisputed Material Facts" ("SMF") [29]. If, however, plaintiff has disputed a specific fact and pointed to evidence in the record supporting its version of events, the Court has viewed all evidence and factual inferences in the light most favorable to plaintiff, as required on a defendant's motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir.1993). Accordingly, the following facts are either not disputed or are viewed in the light most favorable to the plaintiff.

## I. *Factual Background*

### A. The CCCSB and the Center

The CCCSB is a statutorily created agency. Section 37–2–6 of the Georgia Code states in relevant part that:

There shall be created community mental health, mental retardation, and substance abuse service boards, in conformity with the areas established pursuant to subsection (b) of the Code Section 37–2–3, which shall govern publicly funded programs for the purpose of providing

certain disability services not provided by other public or private providers under contract with the regional board. The programs shall be governed by the community service boards, which shall be established as public agencies.

O.C.G.A. § 37–2–6.[1] The CCCSB is vested with the authority to oversee the Center, the vehicle through which it funnels mental health, mental retardation, and substance abuse services to Georgia residents. The Executive Director of the Center answers directly to the CCCSB. The CCCSB's members are appointed by the county governing authorities, in this case the Clayton County Commissioners, and serve in a voluntary capacity. *See* O.C.G.A. § 37–2–6(b)(3).[2] The enabling statute does provide that the board membership will reflect the various groups served, taking into consideration cultural and social characteristics, such as gender, race, ethnicity, age, and disability demographics of the regional and county populations. *See* O.C.G.A. § 37–2–6(c).[3]

Community Service Boards, like the CCCSB, are the "third tier" of service providers for mental health, mental retardation, and substance abuse consumers in Georgia. The Georgia Department of Human Resources Division of Mental Health, Mental Retardation and Substance Abuse is the first line of services for persons seeking such assistance. *See* O.C.G.A. § 37–2–2.1. The second tier service providers are the regional boards. *See* O.C.G.A. § 37–2–5. The regional boards provide fiscal and clinical services oversight for community service boards and other agencies within their regions. *See* O.C.G.A. § 37–2–5–2. The Region II Board is the regional board that provides fiscal and clinical services oversight for the CCCSB.

At all times relevant to the instant action, the CCCSB was comprised of six volunteer members and one *ex-officio* member. (Hibben Dep. at 13–14.) The relevant members and their corresponding races are as follows: (1) defendant Reynolds, a white[4] male who served as Chair-

---

1. Collier does not dispute that community service boards are state agencies. *See Youngblood v. Gwinnett Rockdale Newton Cmty. Serv. Bd.*, 273 Ga. 715, 545 S.E.2d 875 (2001).

2. Typically the Center interviews potential appointees to the CCCSB, and then forwards a letter of recommendation to the Clayton County Commissioners, who in turn make the final decision about who to appoint to the CCCSB. (SMF ¶ 13.)

3. Section 37–2–6(c) states:
 In making appointments to the community service board, the various county governing authorities shall ensure that appointments are reflective of the cultural and social characteristics, including gender, race, ethnic, and age characteristics, of the regional and county populations. The county governing authorities are further encouraged to ensure that each disability group is viably and capably represented on the community service board, and in making nominations for such appointments the board of health shall consider suggestions from clinical professional associations as well as advoca-

cy groups, including but not limited to the Georgia Mental Health Consumer Network, the Georgia Parent Support Network, the Georgia Alliance for the Mentally Ill, the Association for Retarded Citizens, the Mental Health Association of Georgia, the American Association of Retired Persons, Georgians for Children, the Georgia Network for People with Mental Retardation/Developmental Disabilities, the Georgia Association for the Prevention and Treatment of Substance Abuse, and their local chapters and affiliates.
 O.C.G.A. § 37–2–6(c). Only one of six of the appointed CCCSB members were non-Caucasian. Collier asserts that, in contrast, more than 47% of those served by the Center were non-Caucasians. (*See* Letter to Region II attach. as Ex. D to Defs.' Mot. For Summ. J. [45].) Collier has provided no evidence of the racial makeup of Clayton County, but the Court will assume that her figures are close approximations.

4. Defendant uses the term "Caucasian–American" apparently to denote a person who is a

person of the CCCSB, (2) defendant McBroom, a white man; (3) Cecilia Owens ("Owens"), a black woman, (4) defendant Hibben, a white woman, (5) defendant Gaissert, a white woman, and (6) Paula Sherrer, a white woman. (*See* Br. In Supp. Of Summ. J. Mot. [45] at 5–6.)[5] It is undisputed that all individually named defendants acted within the scope of their official duties as members of the CCCSB during all times relevant to this action. (SMF ¶¶ 8–11.) The *ex-officio* member of the CCCSB was Crandle Bray ("Bray"), a white man, who served as Chairperson of the Clayton County Commissioners.

Beginning in August 1999, the Center experienced severe financial problems and low staff morale. (SMF ¶ 16.) First, the Center operated under a budget deficit. Collier attributes the deficit situation not to her management, but to severe legislative budget cuts and to a change in the way Medicaid money was to be reimbursed to the organization. (PSMF ¶ 29.) Collier asserts that the fiscal situation was not

unique to the Center, because community service centers throughout the State of Georgia were facing the same fiscal challenges due to the legislative reduction in the funding of such service centers. (*Id.*)

In addition to the financial strain on the Center, staff morale was low. (Owens Dep. at 23–24.) In November 1999, the CCCSB hired a consultant to conduct a confidential employee survey (the "Employee Survey") to gather the employees' comments regarding the operation of the Center. The result of the survey showed that 80–90% of the staff was displeased with the management of the Center. (SMF ¶ 17.) Although the Employee Survey was mostly multiple choice, approximately ten employees specifically wrote in criticism of the management style of plaintiff Collier and Executive Director David Ashe ("Ashe"). (Pl.'s Resp. To SMF [52] ¶ 17.) The survey revealed a strong distrust among many employees for Collier, and some staff threatened to "walk-out" if Collier was elevated in rank. (SMF ¶ 18.)[6] Collier, however, avers that the

---

member of the white racial group. The Court will use the term "white" or "Caucasian" to refer to such individuals' racial identity. Similarly, the parties use the term "African-American," again not to reference a national origin claim by plaintiff, but to indicate her racial identity as black. Accordingly, the Court uses the term "black" and "African-American" interchangeably.

**5.** Owens and Sherrer are not named defendants even though they both were members of the CCCSB for all time relevant to this action.

**6.** The Employee Survey results indicate that a large number of employees were critical of management. The employees were asked to rank their responses with scores between 1, indicating strong disagreement, and 5, indicating strong agreement. Using this scale, employees ranked their personal satisfaction with the management (average 2.3 out of 5.0) higher only than their personal satisfaction with promotions (average 2.2 out of 5.0) and equal to their personal satisfaction with collaboration (2.3 out of 5.). (Employee Survey at 2 attach. as Ex. L to PSMF.) The three

lowest scores for questions about satisfaction with work environment include "employees have a voice in decision making" (2.2 out of 5.0), "I feel a high level of job security" (2.3 out of 5.0), and "management makes good decisions" (2.3 out of 5.) When employees were asked to list the top three thing that they believed would make them feel better about the organization, 48% ranked the management or management staff relations as their biggest complaints. (*Id.*) Topping the list of the greatest source of "weakness" was "management, decision-making process, too many layers of management." (*Id.* at 3.) Topping the list of the greatest source of "frustration" associated with the organization was "poor management, too many layers of management." (*Id.*) In the section where the employees were asked to "write in" additional comments, the survey tabulator noted that "the responses were so diverse that no trends were identified," but that 48% of the responses complained of management. Select comments include: "change in management," "better relationship between staff and management," "Fire Margaret Collier and put

survey results were not intended to nor designed as a rating or performance instrument and that the CCCSB was informed of this fact by the consultant who performed the survey. (Pl.'s Resp. To SMF [52] ¶ 17.)

### B. Collier's Employment at the Clayton County Service Center

Collier first became affiliated with the Center in 1994 as a contract employee. (Pl.'s Stmt. Of Mat. Facts [52] ("PSMF") ¶ 12.) [7] The duties of Collier's contract position included review of the child adolescent services program and design of day treatment services for the organization. (*Id.*) Collier's, next position at the Center was entitled Child Adolescent Service Coordinator. (PSMF ¶ 14.) Her duties were to continue with the day treatment services program, to assume the responsibilities for child and adolescent services, and to perform a variety of administrative duties. (*Id.*) She served in this position until sometime in 1996. (PSMF ¶ 15.)

In 1996, the Center underwent a reorganization. The result of the reorganization was the creation of the Executive Director and Associate Director Positions, under whom the managers of various Center programs served. (PSMF ¶ 16.) Ashe served as Executive Director from 1997 until the end of January 2000. (PSMF ¶ 17.) In the 1996 reorganization, Collier applied for and received the position of Manager of Behavior Health Services. (PSMF ¶ 18.) Collier states that she spent most of her time reviewing service implementation issues and the remainder of her time completing administrative duties. (PSMF ¶ 20.)

After almost a year of serving as Manager of Behavior Health Services, Collier was promoted to the position of Associate Director of Clinical Services. (PSMF ¶ 22.) Collier had applied for the promotion and competed for the position against two other applicants, one of whom was defendant Wiggins. (PSMF ¶ 23.) Wiggins was given the position of Associate Director of Administrative Services, and was responsible for facilities maintenance and administration. (PSMF ¶ 25.) [8] Collier notes that, by her estimation, ap-

---

Jimmy Wiggins in her position," "fire all top management," "Eliminate the Clinical Services Associate Director, or make the changes necessary to make it work," "management more professional," "management not to be partial," "consistency in management," "New executive director," "new deputy director," "more proactive leadership at top," "change in management," "a less defensive management posture," "Quality leadership," "new management," "improved upper management," "competent upper management," "an Associate Director of Clinical Services that can be respected," "management to be held accountable & equal in the selection of managers," "Decrease sneekiness [sic] and deception by upper management," and "a change in upper management—fire Dave Ashe & Margaret Collier." (*Id.* at 7–16.)

7. Prior to her employment at the Center, Collier had been employed at an Armed Forces Base in Germany as a Family Child Care Director, at Charter Hospital of Augusta as a Family Therapist, and then as Program Administrator over the Adolescent Unit, at the "start-up" Brightmore Day Hospital, as one of the hospital administrators, and then at Crescent Pines Hospital of Atlanta as the Director of Child Adolescent Services. (PSMF ¶¶ 4–10.) In addition, Collier obtained a bachelor's degree in Psychology, *summa cum laude* from Knoxville College, a Master's Degree in Psychology from Auburn University, and completed the necessary course work for a Ph.D. in Industrial Organizational Psychology at Auburn University. (PSMF ¶¶ 1–3.)

8. Wiggins previously had managed Health and Safety Facilities, Preventative Maintenance and Building Maintenance, and had supervised Day Treatments, Case Management and Residential Services. (Wiggins Dep. at 10.) Wiggins' tenure at the Center spanned over 28 years. (SMF ¶ 40.) Ashe stated that he had always been pleased with Wiggins' performance, when Wiggins was under his direct supervision. (*Id.*)

proximately 85% of the personnel of the Center reported directly to her. (PSMF ¶ 24.) Collier served in this position from 1997 until her resignation in June of 2000. (SMF ¶ 1; PSMF ¶ 26.)

In August 1999, around the time that the Center began experiencing the above mentioned financial difficulties, Collier began to develop a business plan for the Center that would purportedly be responsive to the new fiscal environment. (PSMF ¶ 32.) She asserts that she assumed some of the responsibilities for fiscally managing the Center after the Assistant Director retired in November 1999. Part of the "corrective action plan" developed by Collier included a reduction in force ("RIF"). (PSMF ¶ 33.) Collier states that she created the RIF plan based on her assessment of whether a position was necessary, and did not examine the qualifications of the individual who occupied the position. (SMF ¶ 36.) Kelly Hainey ("Hainey"), who served as Personnel Manager for the Center under Collier from January of 1999 until June of 2000, testified that, in deciding which positions to abolish, Collier and Hainey evaluated all positions in the Center. (PSMF ¶¶ 36, 37.) Collier states that she decided that the position of Associate Director of Facilities Management, defendant Wiggins' position, was not needed as his duties could be assumed by a manager level position. (*Id.*) Ashe approved Collier's suggested "corrective action plan" and accompanying RIF selections.

By letter dated January 21, 2000, Ashe informed all individuals selected for the RIF that their jobs were being eliminated and that their last day of employment at the Center would be February 4, 2000. (PSMF ¶ 40.) Hainey testified that the RIF provided thirty days notice to the employees affected, the effect being that they would remain on the payroll as employees for thirty days before being termi-

nated. (PSMF ¶ 39.) Under the terms of the RIF letter, Wiggins would continue to be employed by the Center until February 29, 2000. Wiggins, however, was the only employee actually asked to leave the Center, as part of the RIF plan, at the close of business on January 21, 2000. Collier asserts that he was offered the option of working from home during the thirty day period so that he could search for other employment, and that Wiggins chose to work from home. (*Id.*)

## C. The Interim Director Position

On January 27, 2000, without the approval of the CCCSB, Ashe appointed Collier as Interim Executive Director. (SMF ¶ 20; PSMF ¶ 44.) According to defendants, but disputed by plaintiff, this action by Executive Director Ashe represented a change in the policy regarding administrative coverage of the Center. That same day, Ashe sent the CCCSB a memorandum informing the CCCSB of his plan to take extended FMLA leave, the new change in the policy, and his selection of Collier as Interim Executive Director. (Reynolds Dep. at 34.) Ashe took FMLA leave on January 29, 2000, due to a serious illness in his family. (PSMF ¶ 41.)

Prior to January 26, 2000, Ashe had developed a written policy that called for the rotation of administrative coverage when the Executive Director was absent from the Center. (PSMF ¶ 44.) This policy provided that in the absence of the Executive Director, the Assistant Director, the Associate Director of Administrative Service (Wiggins) and the Associate Director over Clinical Services (Collier) would rotate as Interim Executive Director. (PSMF ¶ 45.) Because Collier and Ashe were in the process of eliminating, or trying to eliminate, the position of Mr. Wiggins, who had competed against plaintiff for the Associate Director of Clini-

cal Services position, this meant that plaintiff would be the only official on the rotation list who would still be employed and thus able to fill in for Ashe temporarily.[9] Accordingly, Ashe amended the Center policy to state that "when the Executive Director is absent from the office, the Associate Director will be administratively in charge." (PSMF ¶ 47.) Collier asserts that, under both the old policy and new policy, she was the only person eligible to assume the position of Interim Executive Director. (PSMF ¶ 48.) Of course, Collier's assertion concerning the old policy is accurate only if Wiggins had been effectively RIF'd.

Defendants respond that the new policy developed by Ashe on January 26, 2000 could not have been properly implemented without the approval of the CCCSB. (SMF ¶ 20.) The CCCSB states that Ashe did not enjoy the unilateral power to determine who would occupy the position of Interim Executive Director, a position answerable directly to the CCCSB, while he was on FMLA leave.

Collier asserts that Ashe did in fact enjoy the authority to develop the new policy and appoint her to the position of Interim Executive Director. To buttress this contention, Collier points to language in the policy manual purportedly delegating authority to the Executive Director to establish rules and regulations affecting employment within the Center. Policy 1110–04 provides in relevant part:

> With respect to any area of organizational activity wherein the Board has rendered no policy guidance, the Executive Director is free to create and follow any policy which is legal, ethical, and in compliance with the spirit of the policy which has been stated, *subject to subsequent Board review and approval.*

*Generally* the Executive Director is empowered to assign and utilize resources within budget restrictions; to employ, promote, discipline and deploy staff, to translate policies of the Board into actions; to speak on behalf of the agency as the agent of the Board; and to organize and delegate for results as she/he deems appropriate.

(PSMF ¶ 43) (emphasis added). This delegation language does not directly afford the Executive Director the authority to choose who will replace him or her when absent from the office on an extended stay, however. Furthermore, the clear language of the passage provided by Collier to support her contention that Ashe enjoyed the unilateral power to determine a policy who would replace him indicates that the opposite is true: the passage states that *any* policy enacted by the Executive Director is subject to the "subsequent Board [the CCCSB] review and approval." (*Id.*) It is undisputed that the CCCSB did not approve of Ashe's new policy concerning his replacement during absences. Therefore, pursuant to the language quoted by Collier, Ashe's amended policy that effectively named Collier as acting Interim Executive Director was not implemented. The CCCSB states that due to the financial crisis at the Center and the results of the Employee Survey, they disagreed with Ashe's decision to appoint Collier as Interim Executive Director. (Owens Dep. at 54.)

Further, prior to taking FMLA leave, Ashe had previously forwarded Collier's proposed "corrective action plan," and accompanying RIF proposal, to the CCCSB and the Regional II Board for its review and approval. After learning of Ashe's planned FMLA leave, the Region II Board

---

**9.** As noted, the Assistant Director had recently retired and there were no plans to fill her position. (PSMF ¶ 47.)

sent Collier and the CCCSB a letter dated February 3, 2000, that indicated the corrective action plan developed by Collier would only be viable as long as the Center did not change the Executive Leadership. The Region II Board stated that:

key to the overall success of this plan is to have consistent executive leadership throughout the planning and implementation. To date the Region 2 Board has been pleased to work with you [Collier] in your capacity as the designated CSB board management liaison and Ms. Cecilia Owens as the designated CSB liaison during this process. This continues to be both an effective and good working relationship and we have confidence that our continuing work will result in a successful outcome.

With the recent development last week in which your organization's Executive Director, David Ashe took a leave of absence it becomes very critical that existing agency executive leadership remains stable and continues in support of your organization's defined plan. Any further leadership changes will further impact the feasibility of the submitted plan.

(Letter dated February 3, 2000 attach. as Ex. R to Pl.'s Br. In Opp'n Of Summ. J. Mot. [52].) Collier infers that this letter indicates that the Region II Board supported her candidacy for Interim Executive Director. (PSMF ¶ 75.)

On February 4, 2000, the CCCSB had a closed-door meeting. At this meeting, they decided not to implement the RIF and also tentatively decided to appoint defendant Wiggins as preliminary Interim Executive Director. Although the CCCSB did not realize it at the time, they were not allowed to conduct a vote in a closed meet-

ing, due to the State open records/open meetings laws. (Owens Dep. at 53–54.)

On February 7, 2000, Collier and members of her management board[10] sent a letter to the Region II Board. In that letter, Collier and her colleagues complained that the CCCSB violated the State open records/open meetings laws in the closed session February 4, 2000 meeting. (PSMF ¶ 53.) The letter also complained that the CCCSB had placed "the provision of services to its 2,438 consumers at serious risk" by failing to implement the RIF as proposed by Collier. (*Id.*) In addition, the letter claimed that the CCCSB's incumbent membership had been appointed in violation of the law, which required the representatives of the CCCSB to reflect the race of the people served by the CCCSB, although the letter does not indicate that anyone in the CCCSB or at the Center actually engaged in any racially discriminatory activities toward plaintiff or anyone else. Plaintiff indicates that the contents of the February 7, 2000 letter were reported to the local media. (PSMF ¶ 54.) In addition, Collier claims that she had previously spoken out against the CCCSB because the racial make-up of the CCCSB did not mirror those serviced by the Center, but she has failed to provide specific examples of such conduct.

Upon receipt of the letter, the Region II Board informed the CCCSB of its content. (PSMF ¶ 55.) CCCSB Chairman Reynolds stated that Collier's letter was "kind of upsetting" because he interpreted the letter to indicate that Collier wanted the CCCSB replaced. (*Id.*) At some point, the CCCSB discussed Collier's letter and was concerned by her complaints. (*Id.*)

---

**10.** Specifically, Collier was joined by Hainey, Paul Stinson, a manager in the Behavioral Health Services division, Janice Heckler, a quality process improvement coordinator, and Norma Edwards, the Director of Resource Development and Public Relations. (*See* Letter to Region II attach. as Ex. D. to Defs.' Mot. For Summ. J. [45].)

On February 10, 2000, Collier's legal counsel threatened the CCCSB with legal action if it did not appoint Collier as the Interim Executive Director. (Br. In Supp. Of Defs.' Mot. For Summ. J. [45] at 10.) [11] The letter also complained of the CCCSB's intention to appoint defendant Wiggins as Interim Executive Director. (*Id.*)

On February 14, 2000, the CCCSB voted to appoint Wiggins to the position of Interim Executive Director. (SMF ¶ 26.) [12] On February 14 and 15, 2000, Collier and six of her management team members abruptly took FMLA leave.[13] Defendants vigorously assert that these seven individuals' exercise of FMLA leave was improper and that their action constituted a "walk-out," as a result of their pique over plaintiff not receiving the interim appointment. (SMF ¶ 27.) Collier responds that she properly took FMLA leave due to stress and ulcers. (PSMF ¶ 27.) The facts, which strongly support defendants' characterization, are discussed *infra* on pages 1357–59.

On March 7, 2000, Collier filed a charge of discrimination with the EEOC. In their position statement, defendants responded to the allegation by stating that:

> Collier['s] appointment to the position of Interim Executive Director by Ashe was an illegal and improper use of administrative authority... the Board chose to place ... Wiggins in the position of Interim Executive Director because he was the person deemed most capable of managing the Center during a difficult period of financial crisis given his background and experience with the Center.

(PSMF ¶ 66.) In support of their position that Wiggins was better qualified, the defendants stated that:

> Mr. Wiggins was the appropriate person to fill the position of Interim Executive Director given that his seniority at the Center and his excellent rapport with staff members. Given the climate at the Center at that time, it was imperative to have someone at the helm who could manage the financial crisis and boost the morale of the staff following the Reduction in Force. Mr. Wiggins has been with the Center for approximately twenty-eight years and served in a number of capacities, including Interim Executive Director during the absence of the Executive Director. Moreover, in his most recent prior assignment as Assistant MH/MR/SA Area Program Director, Mr. Wiggins was responsible for managing and supervising a staff of 260 persons and facilitating a budget of twelve million dollars. Additionally, it was clear from Employee Survey results gathered in 1999 that Ms. Collier was not able to endear herself to the staff in a constructive manner which would facilitate building morale during downsizing.

(CCCSB's Position Stmt. attach. as Ex. M to Defs.' Br. In Supp. Of Summ. J. [45].)

Collier, however, asserts that she was more qualified than Wiggins to serve in the position of Interim Director. (PSMF ¶ 77.) Collier notes that her direct experience in overseeing the main functions of the Center and her good working relationship with the Region II Board uniquely

---

11. Curiously, none of the parties have indicated what benefits came with the position of Interim Executive Director besides presumably more work and, perhaps, more prestige. There is no evidence that a pay raise was granted in connection with the greater responsibilities. In addition, the position was necessarily temporary: hence the qualifier, "Interim."

12. Wiggins served in the position of Interim Executive Director for well over a year before he was selected to fill the position on a permanent basis. (PSMF ¶ 104.)

13. The members of Collier's management team who took FMLA leave, include Haynie, Carolyn Arnett, Angela Branyon, Tracy Cepull, Janice Heckler and Paul Stinson.

qualified her to serve as Interim Director. (*Id.*) Furthermore, during the time that Collier served in the Associate Director of Clinical Service position, Collier supervised approximately 300 employees during which time she contends that there was not one formal complaint filed against her by staff or consumers concerning her management style. (PSMF ¶¶ 78, 83.) In contrast, she notes that Wiggins managed no employees at the Center as the Assistant Director of Facility Management. (*Id.*) Collier further notes that she "met, exceeded, or far exceeded" all of the goals and objectives that were given to her and that Ashe always rated her performance above average. (PSMF ¶¶ 79, 80.)

Collier has also presented evidence that she indicates is suggestive of an improper racial motivation by the Board. The Court will discuss these allegations *infra.*

### D. Collier's FMLA Leave and Claims Emanating Upon Return From That Leave

Collier took FMLA leave on February 14, 2000 because she claims she suffered from severe stress and developed stomach ulcers. (PSMF ¶ 91.) On that same day, six members of Collier's management team also requested FMLA time and did not report to work. As a result, defendants assert that Collier and her team improperly took FMLA leave in an attempt to organize a "walkout," when it became clear that the CCCSB was not going to appoint her to the Interim Executive Director position. (Defs.' Br. In Supp. Of Mot. For Summ. J. [45] at 16.)

In support of their contention that Collier's asserted FMLA leave was improper, defendants submit the affidavit of Debra Hoobler ("Hoobler"), a former member of Collier's management team. In her affidavit, Hoobler states that prior to February of 2000, Collier had used employees' fears about the financial crisis to foster an "us

against them" mentality. (Hoobler Aff. ¶ 3.) Hoobler continues that Collier demanded loyalty from her management team members and "castigated those who held divergent views." (*Id.*) When Hoobler returned in early February of 2000 from leave that she took due to a family illness, Collier informed her that Wiggins was slated to be appointed Interim Executive Director and stated that Wiggins was going to fire all persons on Collier's management team when he took office. (Hoobler Aff. ¶ 4.) As a result of the proposed appointment of Wiggins, Hoobler claims that Collier "orchestrated a 'walk-out' of her management team to foil Mr. Wiggins'[s] appointment and to show the [CCCSB] that without Ms. Collier's team, the Center would be left in ruin." (*Id.*) Collier stated to Hoobler that "as a result of the 'walk-out,' the Center would be a 'mess' and the Board would realize that Mr. Wiggins was not the appropriate person to manage the affairs of the Center." (*Id.*) Hoobler explained that:

> [a]ccording to Ms. Collier, the management team members were taking leave pursuant to the [FMLA]. Ms Collier further stated that the FMLA documents would be approved prior to Mr. Wiggins'[s] appointment and either left in a location at the Center where they would be found on the day of the "walk-out," or mailed to Mr. Wiggins on the day of the "walk-out," on February 15, 2000. Additionally, all the management team members were to meet at a restaurant in Stockbridge, Georgia to discuss the 'walk-out' and make further plans.

(*Id.* ¶ 5.) Because Hoobler was ineligible for FMLA leave, Collier recommended that Hoobler instead resign. (*Id.* ¶ 6.)

Due to the fact the "Center was undergoing considerable strain and to 'walk-out' at that time would only be detrimental to the Center, its consumers, and to those

staff who chose to 'walk-out'," Hoobler decided not to participate in the walk-out. (*Id.*) When Hoobler informed Collier of her decision not to participate, Hoobler states that Collier became "indignant and aggressive." (*Id.* at 7.) Hoobler notes that Collier used "manipulative tactics to get her to participate in the 'walkout,'" including calling her "at least three times to get me to change my mind [and] telling me I did not have to go to work on the 'walk-out' day." (*Id.*)

In addition, defendants point to the affidavit of Rhonda Wood ("Wood"), a personnel clerk at the Center under the direct supervision of Hainey. Wood notes that Hainey, a member of Collier's management team, discussed with Wood her intention "to join Ms. Collier and the other members of Ms. Collier's management team in a 'walk-out' on the Center." (Wood Aff. ¶ 3.) Wood states that Hainey said to her that she and the other members of the management team were planning to "jointly take" FMLA leave "solely to thwart the appointment of Jimmy Wiggins to the position of Interim Executive Director." (*Id.* ¶¶ 3–4.)

Collier denies that she organized a "walk-out" and denies that she took leave for any reason other than due to her "stress" and "ulcers." (Collier Aff. ¶ 11.) She states that during the time she took the leave, she saw "various professionals," including a pulmonary specialist, psychiatrist, licensed clinical social worker and a gastroenterologist. (Collier Dep. at 201.) Collier states that Ashe signed her FMLA leave form, which seems impossible as Ashe was out of the office on FMLA leave, himself. (*Id.* at 246–247.) Collier also states that she cannot recall whether she or Ashe approved the FMLA forms for the other members of her management team to take the FMLA leave around the same time. (*Id.* at 242–246.) Collier does recall that she ate lunch at an IHOP in Stockbrige, Georgia on the day that she took her FMLA leave with three other individuals from her management team, who either were on leave at that point or who took leave soon thereafter. (Collier Dep. at 233–236.) In addition, she states that two other members of her management team, Haynie and Jan Hecker, who also subsequently went on leave, may have been at the IHOP lunch. (*Id.* at 236.) Haynie admits that she and Heckler were, in fact, present at the IHOP lunch. (Haynie Dep. at 63.)

When Collier returned to employment at the Center in May, after twelve weeks of claimed FMLA leave, she had the same title of Associate Director of Clinical Services and had the same pay. (PSMF ¶ 92.) She claims, however, that she did not have the same responsibilities. (*Id.*) Collier states that she was not given an update on the status of the corrective action plan and was not given a key to enter the building. (*Id.*) She asserts that she was only allowed to supervise approximately ten employees in Utilization Management, all of whom were African–American. (PSMF ¶¶ 92, 93.) Collier claims that she was also excluded from management team meetings. (PSMF ¶ 94.)

Wiggins admits that Collier initially was greeted with a reduction in her former duties following her return from FMLA leave. Wiggins testified that the reason for this action was:

[b]ecause when she left, she and the other managers that left on February 15 and right around that particular time we didn't have the layer of managers. So these folks stepped up and did what needed to be done. [Collier] was out twelve weeks. And for her to walk back in and assume those duties over those people, I didn't feel was right to them. I had some managers express they did not want that to take place. They had

worked hard during that period of time, so I didn't feel it was the right thing to do to the other employees.

(PSMF ¶ 97.) Wiggins has also stated that Collier received new duties because he placed her in a position of Utilities Management Supervisor upon return from her FMLA leave. Wiggins' deposition testimony indicates that Wiggins's selection of Collier to the position of Utilization Management appears to be based in part on her "clinical skills" and "prior managerial experience." (Wiggins Dep. 66–67.) The Utilities Management program was funded by a federal grant that was expected to increase despite the fact that other areas at the Center were decreasing due to the financial crisis. (*Id.*)

Due to the "gutting of [her] responsibilities" and reduction of prestige within the Center, Collier asserts that she was constructively discharged in June of 2000. (PSMF ¶ 99.) Collier testified that she submitted a letter of resignation in June of 2000 because she felt that she "had no choice." (*Id.*) Collier testified as follows:

I felt that the situation I came back to [after] Family Medical Leave was pretty unbearable with all the changes that occurred in my job. I felt that the environment was pretty hostile, individuals were, pretty removed at that point, my job duties changed and frankly that was pretty insulting to me, also, it was pretty much a situation that was intolerable to me.

(*Id.*) Collier further testified that she resigned because:

My duties and responsibilities were stripped from me. I had a lower reporting responsibility within the Center. Prior to taking FMLA leave I was second in charge of the [Center]. However, when I returned I was one of approximately twelve peer employees reporting to Mr. Wiggins... I had no choice to resign because my reputation was de-

stroyed, I was not able to contribute to the organization, I was being scrutinized unjustifiably when I came back from FMLA leave, I had been threatened with termination by a Board Member, Crandle Bray, and my capacity to function as a professional was ruined.

(*Id.*) When Collier resigned, she provided a letter that indicated the reason she decided to resign was because of the "extreme hostility of the work environment at the Clayton Center." (PSMF ¶ 101.)

## II. Collier's Claim and Procedural Background

On June 20, 2000, Collier filed suit in the Northern District of Georgia. (Compl.[1].) In her Complaint, Collier asserted a claim for race discrimination, pursuant to 42 U.S.C. § 1983, ("Section 1983"), for a violation of her right to equal protection under the laws (Count I). She asserted a claim for race discrimination under 42 U.S.C. § 1981 ("Section 1981"), in violation of her right to equality of contract (Count II). She has asserted a claim for retaliation for opposing racially discriminatory practices under Section 1981 (Count III) and also a claim for retaliation for exercising her rights to freedom of speech, under Section 1983 (Count IV). Finally, she has asserted a claim under the FMLA for retaliation for exercising her rights under that statute (Count V).

On October 4, 2000, plaintiff moved to amend her Complaint to add a claim for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.* (Count VI). Defendants did not oppose that motion. Further, Collier alleges that the Center Board's acts and omissions caused her "severe emotional pain and suffering, sadness, anger, humiliation, loss of self worth, depression and stress." (Compl. [1] § 27.)

On August 22, 2000, defendants filed a Motion for a More Definite Statement or, in the Alternative, to Dismiss [7]. In an Order dated January 11, 2001, the Court denied defendants' motion for a more definite statement, but granted in part defendants' motion to dismiss [7]. Specifically, all claims against the individual defendants in their official capacities were dismissed. In addition, plaintiff's claims under Title VII and the FMLA were dismissed as to defendants Reynolds, Wiggins, McBroom, Hibben, and Gaissert, in their individual capacities. Furthermore, plaintiff's claims under Section 1981 were merged into her claims under Section 1983 so that, in addition to plaintiff's claims under the FMLA and Title VII, the claims proceeding are a claim for racial discrimination under Sections 1983 and 1981, a claim for retaliation for opposing racial discrimination under Sections 1983 and 1981, and a claim for retaliation under Section 1983 for plaintiff's exercise of her right to freedom of speech by speaking out on a matter of public concern.[14] At that time, plaintiff Collier's Motion to Amend the Complaint [12] to add a claim for race discrimination and retaliation under Title VII was also granted.

On November 13, 2001, defendants filed a Motion to Compel the Production of Collier's Medical Records [38]. As a result of having placed her medical condition at issue through her emotional distress claim and FMLA claim, Collier agreed to provide defendants with an executed medical release and authorization forms for all "practitioners of the healing arts" with relevant knowledge of the facts in the above-styled action. (Pl. Br. In Opp. To Mot. To Compel [43] at 4.) Subsequently, defendants were provided with a copy of Collier's medical records maintained by Karen Sack ("Sack"), a licensed social worker. Defendants contend that the documents produced by Sack were redacted in two places, and possibly others, at the request of plaintiff's counsel. (Br. To Compel [48] at 3.) Therefore, defendants petition the Court to order the production of Collier's unredacted medical records from Sack. (*Id.*) In the alternative, they ask the Court to conduct an in-camera inspection of the unredacted medical records in order to ascertain whether the defendants are entitled to Collier's complete medical records from Sack. (*Id.*)

On December 10, 2001, defendants filed a motion for summary judgment [45] based on their assertion that Collier fails to state a claim upon which relief can be granted and because the defendants are protected by qualified immunity. On that same day, defendants also filed motion for permission to file a brief in excess of twenty-five pages [44]. On February 5, 2002, Collier filed a motion to exceed the page limitation in its reply brief in opposition to summary judgment [52]. Because the issues involved in this case are numerous and complex,[15] the Court **GRANTS** both parties' motions and will consider the briefs in deciding the pending summary judgment motion.

In her brief filed on February 5, 2002, Collier argues that there are genuine is-

---

**14.** The Court indicated that plaintiff could litigate a Section 1981 claim, via a Section 1983 claim. This was perhaps a slight technical misstatement. A plaintiff can make *no* Section 1981 claim against a state actor, but can only proceed on claims otherwise cognizable under Section 1981 through a Section 1983 claim. That is, Section 1983 constitutes the exclusive remedy for violations of the rights contained in Section 1981. *Butts v. County of Volusia*, 222 F.3d 891, 893–94 (11th Cir.2000).

**15.** Indeed, as noted *infra*, the Court would have preferred even more thorough briefs, as the parties neglected to discuss some important issues that must be addressed.

sues to be tried with respect to her claims of race discrimination and retaliation. She asserts that she was uniquely qualified for the position of Interim Director of the CCCSB. She contends that she was passed over for this "promotion" because of her race and out of retaliation for the past exercise of her protected speech rights. Additionally, upon return from FMLA leave and after her filing of an EEOC charge, she asserts that her duties and responsibilities were "entirely gutted" in that she was excluded from meetings, her employment was threatened by management officials, and she was thus constructively discharged. Plaintiff has brought a Title VII claim for alleged retaliation against her upon her return from her FMLA leave.

### DISCUSSION

Plaintiff Collier's claims appear to be based on two incidents: (1) the CCCSB's failure to appoint her Interim Executive Director, a decision that she asserts was based on discrimination against her because she is African–American and in retaliation against her for "speaking out" on issues of public concern in a letter she sent to the Region II Board, and (2) the Center's "constructive discharge" of her from employment in retaliation for her taking FMLA leave and filing an EEOC charge. Defendants have filed a motion for summary judgment as to all of plaintiff's claims based on the two above mentioned incidents.

### I. Summary Judgment Standard

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment

against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. 2548.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. 2548; *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir.1990). The movant is not required to negate his opponent's claim, however. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence [16] designating " 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. 2548 (quoting FED. R. CIV. P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

---

**16.** The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248, 106 S.Ct. 2505. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. 2505. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

## II. *First Amendment Retaliation Claim Under Section 1983*

### A. *Background*

Collier has asserted claims against all defendants under 42 U.S.C. § 1983, as a result of the defendants' refusal to appoint her, or to honor Ashe's decision to appoint her,[17] as Interim Director of the Center during the pendency of Ashe's temporary absence on FMLA leave. She argues that this refusal constituted retaliation directed at her because of protected First Amendment activity. Section 1983 prohibits a governmental entity from depriving a citizen of rights secured by the federal Constitution or law.[18] In order to establish a claim under Section 1983, the plaintiff must show a violation of a right secured by the Constitution of the United States, and

---

**17.** Plaintiff appears fixated on one particular argument: that Ashe had the power to name her interim director and that the Board had no power to undo that decision. Obviously, the latter is untrue, as a practical matter, because, upon learning of Ashe's efforts to insure that plaintiff would be named as his temporary replacement, the Board promptly countermanded that decision. Moreover, as noted *supra* at 1354–55, the Board appears to have had the legal authority to approve or disapprove Ashe's decision as to who should be his temporary replacement while he was on an extended leave. Of course, such a conclusion only makes good common sense. Had Ashe picked someone, other than plaintiff, who was clearly incompetent to run the Center temporarily, no one would argue that the Board had to sit idly by and accept such a decision. After all, Ashe answered to the Board, not the other way around.

Moreover, it is undisputed that the rotation plan initially called for the assistant director to substitute for the director, and plaintiff was certainly not the assistant director—a position that had become vacant through the recent retirement of the incumbent. It was only through Ashe's arguably surreptitious change of the plan, as well as his and plaintiff's efforts to RIF Jimmy Wiggins, that the plaintiff was able to assert any entitlement to the temporary director's position.

Ultimately, however, the Court has difficulty discerning what difference it makes whether one characterizes the Board's decision as an affirmative decision not to have plaintiff assume the temporary position or as a rejection of Ashe's efforts to appoint her: the bottom line is that plaintiff was not allowed to serve as the Interim Executive Director in Ashe's absence.

**18.** Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

also that the deprivation of that right was committed by a person acting under color of state law. *Cummings v. DeKalb County,* 24 F.3d 1349, (11th Cir.1994); *see also Graham v. Connor,* 490 U.S. 386, 393–394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (" § 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred") (internal quotes omitted) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).

Plaintiff asserts that she engaged in First Amendment protected speech when she sent a letter on February 7, 2000 to Region II members, complaining about the racial composition of the Center Board and about budgetary and management issues at the Center, itself. (Feb. 7th Letter attach. as Ex. K to Plt.'s Opp. to Mot. Sum. J. [52].) She contends that because she voiced these complaints, the Board declined to appoint her as interim director during Ashe's period of FMLA leave. The Court will first address the potential liability of the Board, itself, on this claim and next address the potential liability of individual defendants who have been sued.

## B. *Liability of Center Board*

### 1. *Can the Board even be sued?*

█ Defendant Board has argued that the Eleventh Amendment to the United States Constitution bars plaintiff's suit against it or its members in their official capacity. Defendant correctly notes that the Eleventh Amendment prohibits suits against a state in federal court brought by its own citizens or by citizens of another state.[19] *See Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *see also DeKalb County Sch. Dist. v. Schren-*

ko, 109 F.3d 680, 687 (11th Cir.1997) (per curiam) (the Eleventh Amendment constitutes an "absolute bar" to suits against a state by its own citizens); *Stevens v. Gay,* 864 F.2d 113, 114 (11th Cir.1989) ("The Eleventh Amendment insulates a state from suit brought by individuals in federal court unless the state either consents to suit or waives its Eleventh Amendment immunity.") (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98–100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)).

█ An assertion of Eleventh Amendment immunity essentially challenges a court's subject matter jurisdiction: "The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed on federal jurisdiction." *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 72–73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The issue of Eleventh Amendment immunity must be resolved before a court may address the merits of the underlying claims. *See Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 94–103, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (courts must have Article III jurisdiction before addressing merits of action).

█ Plaintiff does not dispute that the CCCSB is a state agency. State agencies and state officials sued in their official capacities are afforded immunity from suits in federal court, unless the state has waived its immunity or Congress has exercised its right to override the state's immunity pursuant to the Constitution of the United States. *See, e.g., Robinson v. Georgia Dep't of Transp.,* 966 F.2d 637, 638, 640 (11th Cir.1992), *cert. denied,* 506

---

19. The Eleventh Amendment provides that:
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 U.S. Const. Amend. XI.

U.S. 1022, 113 S.Ct. 660, 121 L.Ed.2d 586 (1992); *Cross v. Alabama,* 49 F.3d 1490, 1502 (11th Cir.1995). To constitute waiver, state law must provide "unequivocal indication that the state intends to consent to federal jurisdiction. Otherwise, it will be barred by the Eleventh Amendment." *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238 n. 1, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985).

There is clearly no evidence that waiver or abrogation exists in this case. Further, plaintiff concedes that she cannot sue the Board or its members in their official capacity for monetary damages. As a result of this concession, the Court does not have to determine whether the Eleventh Amendment would protect the defendant Board from imposition of monetary damages in this case. Yet, plaintiff makes only a partial concession, noting that the Eleventh Amendment does not insulate state officials acting in their official capacities from suit in federal court, at least to the extent the complainant seeks prospective injunctive relief. *Welch v. Laney,* 57 F.3d 1004, 1008 (11th Cir.1995). In that vein, plaintiff asserts that a state employee's demand for reinstatement constitutes prospective relief that is not barred by the Eleventh Amendment. *See Cross v. Alabama,* 49 F.3d 1490 (11th Cir.1995) (prospective relief of reinstatement not barred by Eleventh Amendment).

■ Defendants have not disagreed with plaintiff's contention that she can still sue the Board for prospective relief—that is, reinstatement—notwithstanding the Eleventh Amendment. Accordingly, the Court concludes that the equitable remedy of reinstatement is not barred by the Eleventh Amendment. *See Lassiter v. Alabama A & M Univ., Bd. of Trs.,* 28 F.3d 1146, 1152 n. 9 (11th Cir.1994) (adopting conclusions reached by the panel in *Lassiter II* ); *Lassiter v. Alabama A & M Univ., Bd of Trs., (Lassiter II),* 3 F.3d 1482, 1485 (11th Cir.1993) (§ 1983 claim against University President in his official capacity, seeking prospective relief of reinstatement, was not barred by the Eleventh Amendment); *Flood v. State of Ala. Dep't of Indus. Relations,* 948 F.Supp. 1535 (M.D.Ala.1996) (finding no jurisdictional impediment to an action against defendant in his official capacity under § 1983 for the sole purpose of obtaining prospective injunctive relief of reinstatement); *LaFleur v. Wallace State Cmty. Coll.,* 955 F.Supp. 1406, 1423 (M.D.Ala.1996) (an order of reinstatement is type of prospective relief). Therefore, the Court concludes that the Eleventh Amendment poses no bar to this claim, to the extent that plaintiff seeks only reinstatement.

Therefore, the Court will next deal with the merits of plaintiff's First Amendment retaliation claim, before returning to the question whether reinstatement would be available to her.

### 2. *Merits of First Amendment Retaliation Claim*

### a. Legal Standards for Claim

Courts have developed a four step analysis by which to judge an employee's claim that he was retaliated against by his public employer as a result of the employee's exercise of his right to freedom of speech. *Anderson v. Burke County,* 239 F.3d 1216, 1219–20 (11th Cir.2001). The first two steps constitute questions of law that must be determined by the court. First, the court must determine the threshold legal question of whether the employee's speech may be "fairly characterized as constituting speech on a matter of public concern." *Brochu v. City of Riviera Beach,* 304 F.3d 1144, 1157 (11th Cir.2002) (citation omitted). This determination involves an examination of the content, form, and context of the speech. *Id.* Only if the court answers this question affirmatively does it

need to move to the next inquiry: weighing the interest of the public employee against the interest of the public employer. This balancing test, derived from the Supreme Court's decision in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), has become known as the *Pickering* balancing test. *Id.*

The factual questions that constitute the third and fourth prongs of the test arise only if the first two prongs test are satisfied. The third prong requires a determination whether the protected speech played a substantial part in the employment decision. *Brochu, supra,* citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Finally, if the particular speech did play a part in the employer's decision then the burden switches to the employer to satisfy the "but for" test: that is, to show that the employer would have made the same decision even had it not been aware of the employee's protected speech. *Id. Accord Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir.2001) (mixed motive defense remains viable in both Title VII and § 1983 First Amendment retaliation cases, notwithstanding weakening of same in substantive Title VII claims).

**b. Facts in this Case**

Defendants have provided a time line of some of the relevant events in this litigation. *(See* Def.'s Br. [45] at 9–11.) In August of 1999, Ashe notified the Board of severe concerns about the financial stability of the center. In November of 1999, employees at the Center were surveyed and they revealed dissatisfaction with the leadership of Ashe and plaintiff.[20] On January 21, 2000, David Ashe unilaterally changed the Center Policy 110–04 regarding administrative coverage of his position in his absence to read only "Associate Director" (plaintiff's position), rather than "Assistant Director," as the policy had originally been written; Ashe neither advised the Board of this change nor sought their approval. Around this same time, Ashe, together with plaintiff, devised a plan to reduce the work force and included, as part of their RIF, Jimmy Wiggins, who like plaintiff was an Associate Director. This action, combined with the change made by Ashe to the Center Policy, meant that plaintiff would automatically become Interim Director upon Ashe's taking of FMLA leave. Then, on January 27, 2000, without the knowledge of the Board, Ashe took his FMLA leave.

Once aware of what has transpired, on February 4, 2000, the Board swung into action and informally decided that it would instead name Jimmy Wiggins, not the plaintiff, as the Interim Executive Director, in Ashe's absence. Three days later, on February 7, 2000, plaintiff and members of her management team wrote a letter to the Region II Board, complaining about various matters with regard to the Center Board and the Center, itself. On February 10, 2000, plaintiff's legal counsel threatened the Center Board with legal action if Wiggins were named over plaintiff as the interim director. Nevertheless, on February 14, 2000, the Board officially ap-

---

**20.** The Court is aware that plaintiff asserts that one should not read too much into this survey, as it was not designed to rate management, and that she interprets the survey differently. Nevertheless, as noted *supra* at 1351–52, one could fairly read the survey as indicating negative views of plaintiff's leadership and, in fact, defendant has offered evidence that it so interpreted the survey in this fashion. (Def.'s Br. [45] at 9). *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir.2001) (plaintiff employee may not question the wisdom of the employer's reason as long as the reason is one that might motivate a reasonable employer) (citation omitted).

pointed Wiggins as the Interim Executive Director. On that same date, plaintiff and six members of her management team "walked-out," taking leave under the FMLA. Defendant has produced evidence by people to whom plaintiff directly spoke that the walk-out was done intentionally with the hope of bringing the operations of the Center to a halt. Plaintiff then stayed out of work for the entire three month period permitted by the FMLA.

### c. Application of the Law to these Facts

The first question that the Court must address is whether plaintiff engaged in protected speech. Of course, the answer to that question depends on whether plaintiff's speech constituted a matter of public concern, as opposed to a matter connected to plaintiff's own personal ambitions. Plaintiff has contended that the February 7th letter to the Regional Board, signed by her and members of her management team, constituted protected speech.[21] Summarized, this letter complains about the following matters: (1) the Board's holding of a secret meeting in which it rescinded Ashe and plaintiff's proposed reduction in force; (2) the Board's undermining of the Center's "present leadership;" (3) the deficits under which the Center was operating; (4) past non-compliance with Georgia law in the appointment of the Center Board; and (5) the failure of the Board to represent, in terms of racial and disability demographics, the population that it serves, as required by Georgia law.

(Feb. 7th letter attach. as Ex. K to Pl.'s Br. [52].) The letter ends by urging the Regional Board to relieve the Center Board of its duties, to implement the deficit reduction correction action previously submitted to the Regional Board, and to "sustain and support present leadership" at the Center. (Id.)

Plaintiff argues that this letter touches on matters of public interest.[22] In determining whether speech involves matters of public interest, a reviewing court must attempt to determine the goal of the speech. If the governmental employee speaks "not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest," a federal court will rarely be the appropriate forum to gauge the wisdom of any decision taken by the public employer in response to the employee's speech. *Stanley v. Dalton*, 219 F.3d 1280, 1288 n. 13 (11th Cir. 2000), citing *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Moreover, the court must look to the context of the speech and, "when there is a personal element to the speech, complaints of wrongdoing within a public agency may not constitute speech on a matter of public concern." *Stanley*, 219 F.3d at 1288 n. 13. *See Anderson v. Burke County*, 239 F.3d 1216, 1221 (11th Cir.2001) (plaintiff employee's questionnaire concerning deficiencies in department had more to do with plaintiff's grievances as an employee than with concerns of a public nature.)

Examined with the above guidance in mind, the Court concludes that the Feb-

---

21. Plaintiff has also contended, obliquely, that some undescribed communication in December, 1999 by plaintiff regarding racial issues at the Center could also constitute protected speech. (*See* Pl.'s Br. [52] at 17–18.) As plaintiff has not further elaborated on this communication or provided evidence of its existence, the Court has not considered it in its analysis.

22. Plaintiff also argues that this Court has already determined that the letter constituted a matter of public interest when it denied defendant's motion to dismiss. (Pl.'s Br. [52] at 15 n. 4.) Plaintiff has misstated the Court's ruling. Any fair reading of that Order makes clear that the Court was simply ruling that, at the dismissal stage, it could not conclude that the speech was necessarily *not* a matter of public interest.

ruary 7th letter to the Regional Board was drafted largely to further plaintiff's personal ambitions to become the interim director, and that any matters of public interest referenced in the latter were secondary to that overall purpose. It is true that plaintiff did mention the allegedly improper appointment process of the Board and the latter's failure to represent demographically its constituents: both of which facts arguably connote a matter of public interest.[23] Plaintiff also cited the deficit budget figures: a fact that arguably invokes the public interest, but that also was a fact likely already well known to the Regional and Center Board. The overriding "thrust" of the letter, however, was a complaint about the Board's countermanding of the proposed RIF action—which action would have eliminated plaintiff's only competition for the interim spot, Jimmy Wiggins—and the Board's undermining of the "present leadership," both of which comments, taken in context, constitute an indirect complaint by plaintiff that she was not going to be named the interim director. Further, plaintiff's conclusion—that the Board should be temporarily relieved of its duties and that the "present leadership" of the Center should be supported and sustained—was likewise a not so thinly veiled effort to have plaintiff named as the interim director. Thus, the Court concludes that plaintiff has failed the first prong of the test, meaning that her § 1983 First Amendment claim must fail.[24]

Yet, more dispositive even than the non-public nature of plaintiff's letter is the fact that there is no conceivable way that this letter could have caused plaintiff to lose out on the interim job, as the Board had made its decision prior to plaintiff having sent the letter. Indeed, the only reasonable inference from the undisputed facts is that plaintiff only sent the letter because she had learned of the Board's plan to name Wiggins as interim director. Plaintiff attempts to argue that, because the Board did not formally name Wiggins until February 14th, her February 7th letter preceded the Board's action. Yet, the evidence is uncontroverted that the Board had laid the groundwork to name Wiggins during its February 4th meeting. In fact, plaintiff's own conduct supports that inference. Specifically, her own reference in her February 7th letter to the Board's intention to roll-back the RIF plan—which would mean that her competition, Wiggins, would not be fired—and her repeated concerns that the Board was not supporting "present leadership" confirms that plaintiff was aware what was afoot. In addition, Rhonda Woods' testimony, described *supra*, indicates that the walk-out was being planned by plaintiff and her team prior to the date on which Wiggins was officially named the interim director. Finally, plaintiff's counsel's communication to the Board on February 10th, in which counsel threatened the Board with legal action if they did not appoint plaintiff as the interim director, resolves any doubt that plaintiff's letter *followed* the Board's informal decision to name Wiggins as the interim director.

■ Thus, even if the letter constituted a matter of public interest, its timing

---

**23.** Nevertheless, as plaintiff has also consistently complained that the Board discriminated against her racially, when it refused to name her as the interim director, one could also conclude that the reference to the racial composition of the board was also made with a personal objective to further plaintiff's efforts to be named interim director.

**24.** Further, plaintiff's walk-out after Wiggins was named the interim director confirms that her motives in sending the letter were purely personal. That plaintiff and her entire team would do a "sick-out" in an effort to disrupt the Center's operation reveals more powerfully than any argument that plaintiff now makes what her real goal was in sending this letter.

means that plaintiff has shown no causal relationship between the letter and the Board's decision not to name her as the interim director.[25] *Cf. Brochu v. City of Riviera Beach,* 304 F.3d 1144, 1155–56 (11th Cir.2002) (one cannot impute knowledge of protected speech to a decisionmaker who swears that he had no actual knowledge of speech). That is, as a logical matter, a letter that had not yet been sent could not have influenced the Board's earlier decision. Thus, as defendant Board has demonstrated that it had no knowledge of the speech prior to making the adverse decision, it has necessarily shown that it would have made the same decision, even had the speech not occurred, which is the fourth prong of the test. In short, plaintiff has failed to prove a claim for retaliation in response to her exercise of First Amendment rights, in violation of § 1983, and defendant Board is entitled to summary judgment on this ground, as well.

### 3. *Even If Plaintiff Has Asserted A § 1983 First Amendment Retaliation Claim, She Has No Remedy*

■ As noted *supra,* plaintiff cannot receive monetary damages from a state agency, as a result of the Eleventh Amendment immunity that defendant concedes the agency to enjoy. She can, however, enjoy prospective relief: specifically, reinstatement to the position in question. Yet, leaving aside the legal implications of the question whether plaintiff ever held the interim position, such that the Court would be ordering reinstatement, or whether she never held this position, such that the Court would be ordering a promotion, it appears clear[26] that there is no position to which the Court can return plaintiff. That is, plaintiff sought an interim position; yet, there is no longer an interim position.[27] Accordingly, as the Court cannot order the plaintiff reinstated to a job that no longer exists, there appears to be no remedy that can be ordered for plaintiff's claim and, accordingly, defendant Board appear entitled to summary judgment on that ground as well.

### C. *Liability of Individual Defendants*

■ Plaintiff has presumably included the individual members of the Center Board in her § 1983 claim for retaliation in violation of the First Amendment. Unlike the Board, these individual defendants could be held liable for monetary damages.[28] Yet, the defendants have argued

---

**25.** This determination also means that the Court does not have to reach the question whether the defendant Board has demonstrated, as a matter of law, that its decision was based on the survey, which had indicated that staff morale was low and had faulted plaintiff's leadership.

**26.** Although it appears clear to this Court that the interim position in question no longer exists, defendant has not raised this seemingly obvious argument. That omission makes the Court wonder if perhaps its analysis is flawed in some respect on this point. The Court nevertheless brings up the matter, not to raise an argument that the defendant has chosen not to make, but to ensure that the Court does not expend its scarce resources to hold a trial at which the plaintiff will have absolutely no chance at achieving any remedy.

**27.** Apparently, at some point after plaintiff resigned in June, 2000, Wiggins was named the permanent director. (PSMF ¶ 104.) It is not clear from this record exactly why Ashe did not return. He has indicated in his deposition testimony that he was terminated. (Ashe Dep. at 19.) Further, the pleadings indicate that Ashe, represented by the same counsel who represent plaintiff, filed his own litigation against the defendant Board. (*See Ashe v. Clayton County Comm.,* 1:00–CV–1959–CAM.)

**28.** Defendants note that they were unpaid volunteers and that they are protected from a claim by virtue of the Volunteer Protection Act of 1997. (Defs.' Br. [45] at 44 (citing to 42 U.S.C. § 14503).) As the Court determines that defendants have qualified immuni-

that they enjoy qualified immunity as to this claim. (Defs.' Br. [45] at 20–27.) Plaintiff has not contested this assertion of immunity. Moreover, the Court has also determined that, on the merits, plaintiff has not shown retaliation by the defendants in violation of her § 1983 rights. Even were the Court wrong in this assessment, it is clear that the matter is debatable enough so as to lead to the conclusion that the law was not sufficiently established to alert the defendants that they might have been acting illegally. *See Anderson v. Burke County,* 239 F.3d 1216, 1222 (because *Pickering* requires a balancing of competing interests on a case-by-case basis, it is only in the rarest of cases that a public official will truly know that the termination of a public employee violated clearly established rights) (citing *Hansen v. Soldenwagner,* 19 F.3d 573, 576 (11th Cir.1994).)

Therefore, all individual defendants are entitled to qualified immunity on plaintiff's § 1983 First Amendment retaliation claim.[29]

### III. *Plaintiff's Claims of Racial Discrimination Arising from Defendants' Failure to Appoint Her to the Interim Director Position*

#### A. Defendant Center Board's Liability

#### 1. *Interplay of §§ 1981, 1983 and Title VII*

Plaintiff has also claimed that the Board's failure to name, or retain, her as interim director constituted racial discrimination in violation of §§ 1981, 1983, and Title VII. Specifically, plaintiff argues that the Board chose Jimmy Wiggins, a white male, over plaintiff, a black female, and that the choice was based on the race of the candidates.

■ As to the interplay between plaintiff's § 1981 and § 1983 claims, § 1981 prohibits racial discrimination in the formation of a contract, which can include an employment contract. Section 1983 prohibits a state actor from acting in violation of federal law; section 1981 is, of course, a federal law. Eleventh Circuit law clearly provides that, where a plaintiff seeks vindication of rights secured by § 1981 against a state actor, § 1983 provides the exclusive remedy for obtaining relief. *Butts v. County of Volusia,* 222 F.3d 891, 893 (11th Cir.2000).[30] Accordingly, plaintiff's § 1981 claim merges into the § 1983 claim and the latter is the operative claim for purposes of this action. *Vason v. City of Montgomery,* 240 F.3d 905, 906 n. 1(11th Cir.2001).

With regard to the interaction between Title VII and § 1983, the Eleventh Circuit has held that claims under both claims may proceed as parallel actions, even though both claims may allege the same facts and trigger the same analysis. *Johnson v. City of Fort Lauderdale,* 148 F.3d 1228, 1231 (11th Cir.1998). In short, neither Title VII nor § 1981 preempt § 1983. Accordingly, plaintiff's race discrimination claims here will proceed as § 1983 and Title VII claims.

ty for this § 1983 claim, the Court does not reach the implications of the Volunteer Protection Act of 1997.

**29.** It is not clear whether plaintiff is also asserting a Title VII retaliation claim here, as plaintiff sometimes interchanges the two types of retaliation claims. The Court is not aware that plaintiff filed any EEOC charge prior to February 4, 2000, however.

**30.** On a first glance, this might seem to be a form over substance debate, as it is initially not clear what difference it makes whether one calls the race discrimination claim a § 1981 claim or a § 1983 claim. The *Butts* panel noted one distinction: specifically, a plaintiff suing under § 1983 cannot rely on the doctrine of *respondeat superior. Butts, supra,* at 893.

### 2. *Eleventh Amendment Immunity*

At the outset, the Court notes its understanding that, unlike plaintiff's First Amendment retaliation claim, the Eleventh Amendment does not bar plaintiff from receiving monetary damages on her race discrimination claims,[31] should she prevail. The parties do not make this matter clear, however. Plaintiff has simply noted, as a blanket statement, her concession that she cannot receive monetary damages on her claims. (Pl.'s Br. [52] at 13.) Defendant Board has not addressed the matter, explicitly, but the organization of its brief in support of the motion for summary judgment [45] suggests defendant's awareness that defendant Center Board does not enjoy Eleventh Amendment immunity as to plaintiff's race discrimination claims.

 Clearly, the Eleventh Amendment does not preclude a claim of racial discrimination pursuant to Title VII. *In Re: Employment Discrimination Litig. Against the State of Alabama*, 198 F.3d 1305, 1317 (11th Cir.1999); *Cross v. State of Alabama*, 49 F.3d 1490, 1502 (11th Cir. 1995). Moreover, although one will sometimes run across case law[32] that indicates that Congress cannot preempt the Eleventh Amendment through § 1983, the Court notes that the cases that it has read in this regard have not involved racial discrimination claims posited initially through § 1981, whose prohibitions would seemingly be permissible for Congress under the same provision of the Fourteenth Amendment that allowed Congress to override the Eleventh Amendment with regard to Title VII. *Cf. In Re: Employment Discrimination Litig.*, 198 F.3d at 1316–17. In short, without any briefing by

the parties, it is difficult to discern why Title VII could trump the Eleventh Amendment, whereas § 1981, which is the statute whose rights are being vindicated through the § 1983 action, could not override that Amendment. At any rate, because defendant Center Board does not appear to assert the Eleventh Amendment as a defense to any racial discrimination claims, the Court concludes that the defendant Center Board does not enjoy such immunity from these claims.

### 3. *Section 1983 Race Discrimination Claim Against the Board*

As noted, plaintiff claims that defendant Center Board engaged in racial discrimination when it chose as its interim director Wiggins, a white person, over plaintiff, who is a black person. To decide defendant's motion for summary judgment, the Court must apply the appropriate analytic framework. It is well settled that, when a § 1983 action is brought to seek a parallel remedy also sought by a Title VII action, the two statutes have the same elements of proof and analytic framework. *See, e.g., Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir.2001). Therefore, when a plaintiff employee charges racial discrimination under § 1983, a reviewing court applies the same analysis to such a claim as it would were the claim couched as a Title VII action: specifically, the court uses the *McDonnell Douglas* test. *Mason v. El Portal*, 240 F.3d 1337, 1339 (11th Cir.2001). *Cf. Bass v. Board of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1103, 1109 n. 4 (11th Cir.2001) (claims under Title VII and the Equal Protection Clause (§ 1983) are distinct and

---

31. As noted *supra*, plaintiff could also potentially receive reinstatement, except for the fact that the interim job that she sought no longer exists.

32. *See, e.g., Cross*, 49 F.3d at 1502, and cases cited therein. *Cross* involved an allegation of sex discrimination and the panel firmly held that the Eleventh Amendment barred a § 1983 law suit for monetary damages against the State.

employ different standards, but § 1981 and Title VII claims have the same elements).

Applying that familiar test here, absent direct evidence of discrimination,[33] the plaintiff must first make a *prima facie* case, after which the burden switches to the defendant to proffer evidence of non-discriminatory reasons for its actions. If defendant sustains that burden of production, the burden flips back to plaintiff to offer evidence that defendant's reasons are nonetheless a pretext for unconstitutional discrimination. First, the Court concludes that plaintiff has made a *prima facie* case. She, like everyone, is a member of a racial group, and hence she, like everyone, is in a protected group for purposes of Title VII. Further, the Court will assume that she suffered an adverse action by not receiving the temporary appointment as the acting interim director.[34] Because a person outside of plaintiff's racial group received the appointment, she has met the requirement that she show that a comparator was treated more favorably than she. Finally, the Court concludes that plaintiff has met the qualifications prong of the *prima facie* case.[35]

■■■ Plaintiff having made a *prima facie* case, the defendant is then required to produce evidence of neutral, non-discriminatory reasons for its actions. Defendant Board has done so. Defendant has noted its concerns about morale issues and staff dissatisfaction with plaintiff, during her tenure as Associate Director, as evidenced by the staff survey. It has indicated its belief that Wiggins was a better fit for the Center at this precarious point in its history, given his long and successful tenure there. In particular, defendant has noted its belief that Wiggins could better manage the agency and boost morale during this time of extreme financial crisis and belt-tightening by the agency, in which reductions in force would be occurring. Defendant highlights Wiggins excellent rapport with the staff. Moreover, defendant has suggested its concern at the surreptitious manner in which Ashe and plaintiff attempted to confer the status of interim director on plaintiff.

The Court concludes that the above explanations satisfy defendant's burden to proffer non-discriminatory reasons for its decision. Accordingly, to survive defendants' motion for summary judgment, plaintiff must proffer sufficient evidence to indicate that defendant Board's reasons for its decision are nothing but a pretext for racial discrimination. As discussed in more detail *infra*, in the section of this Order discussing plaintiff's Title VII claim, the Court concludes that, to the extent, plaintiff disputes the above reasons, she has failed to show pretext. In short, although plaintiff attempts to shoot holes through the defendant's stated reasons, the Court concludes that she has failed to

---

**33.** Plaintiff has not contended that direct evidence of discrimination exists here.

**34.** Actually, it is not so clear to the Court that this was really an adverse action. The acting position brought no increase in pay or benefits. Moreover, the operative word here is "temporary." While plaintiff may feel that it would have given her a leg up to apply for the permanent position, should it have ever opened up, which it ultimately did, the adverse action would seemingly have occurred only if plaintiff were rejected for the perma-

nent position. Nevertheless, as defendants have not disputed that plaintiff suffered an adverse action, the Court will likewise assume that she did.

**35.** Defendant Board argues that plaintiff was not qualified as a result of the problems she had while she was Associate Director. Nonetheless, defendant's contentions in this regard are best addressed as part of defendant's proffer of non-discriminatory reasons for its actions.

offer sufficient evidence to suggest that these reasons were pretextual.

Yet, although plaintiff has failed to undermine these reasons, she has offered one piece of evidence that does arguably suggest pretext as to one member of the Board. Specifically, plaintiff has proffered the testimony of David Ashe, who has indicated that on three or four occasions, at some unidentified time prior to December 1999, Board Member Bob Reynolds discussed with Ashe racial issues at the Center. According to Ashe, Reynolds made "remarks like white—we don't need black leadership, we are better off without it. We used to have all white leadership, not [sic] we have all black leadership." (Pl.'s Br. [52] at 34). Further, according to Ashe, Reynolds never referenced plaintiff, specifically.[36]

Although the excerpt proffered by plaintiff does not provide much context for the alleged remark by Reynolds, even without any context, the remark gives the Court pause, as it could arguably lead to an inference that Reynolds' later vote on the Center interim director might have been influenced by racial considerations. Accordingly, the Court will assume, for purposes of this discussion, that plaintiff has provided evidence to show pretext on Reynolds' part.[37] The problem for the Court is how to assess pretext evidence directed against only one member of a six member board, when the action of a majority of the board is necessary for the complained of action and when there has been no evidence that anyone else on this board acted under a discriminatory motivation. This would seem to be an obvious question in any analysis of this matter, but, again, the parties have not addressed it in their briefs or otherwise helped the Court grapple with this question. Accordingly, the Court has been forced again to conduct its own research on this matter. From the Court's admittedly non-exhaustive research, it concludes the following.

■ Even though plaintiff has offered evidence arguably showing pretext on the part of Board Member Reynolds, she has offered no evidence suggesting that any other member of the six-member board had a racially discriminatory motivation for choosing Wiggins over plaintiff. The Eleventh Circuit has made clear that, under § 1983, one cannot impose liability on a governmental entity based on evidence of the pretextual motivations of only one of its members; instead, the plaintiff must show that a majority of the members whose votes triggered the adverse action operated under an illegal motivation. *Mason v. El Portal*, 240 F.3d 1337, 1339, 1340 (11th Cir.2001). That court has explained that because, in the context of

---

**36.** Plaintiff has also presented the testimony of a member of her team, Ms. Hainey, that during the selection period, after Reynolds had requested both plaintiff and Wiggins' personnel files, she never observed Reynolds open Wiggins' file. (PSMF ¶ 61). Further, when plaintiff brought in an updated resume and some other information for his consideration, Reynolds only accepted plaintiff's resume and would not accept the additional information. Hainey also noted that Reynolds' interaction with Collier was "snappy" and not in a "professional manner." (PSMF ¶ 62.)

**37.** In its recitation of facts, defendant also mentions a statement by plaintiff in her deposition that she had heard from someone else that a Wilson Moody had made a racially offensive comment at some public gathering, and that Bob Reynolds had chuckled at the comment. (Defs.' Br. [45] at 13.) Plaintiff does not cite this as evidence of pretext in her response brief, presumably because the statement is hearsay and would not be admissible in this matter. *See, e.g., McMillian v. Johnson*, 88 F.3d 1573, 1583–85(11th Cir.1996) (inadmissible hearsay cannot be used to defeat otherwise valid summary judgment motion). Accordingly, the Court does not consider it in its analysis.

§ 1983 actions, only one with final policy-making authority can subject the governmental entity to liability, the existence of an unconstitutional motivation by only one commissioner is insufficient to impute such a motive to the Commission at large. *Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir.2002) Indeed, in the latter case, the Eleventh Circuit noted that liability does not attach even if the other members voting in favor of the adverse action are aware of the unconstitutional motivations of one of its cohorts, as long as they do not share in the unconstitutional motivation. *Id.* at 1297–98. Otherwise, a lawmaker who has sound reasons for voting for a particular measure will be required to vote against his own view of what is best for the community, simply because another lawmaker with a bad motivation plans to cast the same vote. *Id.* at 1298.

Similarly, in *Dixon v. Burke County*, 303 F.3d 1271 (11th Cir. Aug. 29, 2002), a legal advisor to the grand jury, which had the responsibility of filling a vacancy on the school board, suggested that the grand jury choose a person of the same race and gender as the person whose position was being filled, in order to insure balance. Subsequently, the foreman of the grand jury suggested that the attorney's advice be followed. Nevertheless, the grand jury considered all applicants and debated their qualifications, ultimately choosing a person who was, in fact, the same sex and race as the incumbent. Thereafter, the plaintiff filed a lawsuit, alleging sex discrimination in violation of § 1983. In reviewing these facts, the Eleventh Circuit concluded that plaintiff had not proved a claim of discrimination by the grand jury. The panel noted that while one member of the grand jury may have been motivated by gender considerations, there was no evidence that the other eleven members who voted for the successful candidate had done so. *Id.* at 1276 (one would have to "resort to pure speculation" to conclude that the other grand jurors acted out of any gender-based motivation). Accordingly, the panel concluded that the municipality could not be held liable merely because one of the voting members of the decisionmaking group perhaps acted out of a discriminatory motivation.

Like the above cases, in this case, plaintiff has presented no evidence that imputes a pretextual motive to any Board member other than Reynolds. Accordingly, the Court concludes that the defendant Center Board is entitled to summary judgment on plaintiff's § 1983/1981 claim of racial discrimination, via the Board's failure to name her (or keep her) as the Interim Executive Director.

### 4. *Title VII Race Discrimination Claim Against the Board*

As noted, the same *McDonnell Douglas* analysis applies to this claim as was applicable to plaintiff's § 1983/1981 claim. That fact suggests that defendant Board should also receive summary judgment on plaintiff's Title VII claim. Only one concern stops the Court from automatically reaching that conclusion. Specifically, the Court noted above that the alleged pretext on the part of Board member Reynolds could not result in liability for the defendant as plaintiff had failed to show that a majority of the Board operated under such an unconstitutional motivation. In reaching this conclusion, the Court cited several cases consistent with this latter proposition. Yet, the Court feels compelled to note that the above cases were § 1983 cases, which meant that the governmental entity could not be held liable absent a finding that a policymaker or final decisionmaker had made the contested decision. As the majority of a board was the final decisionmaker in the matter before this Court and as plaintiff has failed to

show that any member other than Reynold might have operated under an improper motivation, summary judgment was appropriate on this § 1983 claim.

█ With Title VII, however, there is no comparable *Monell*[38] requirement that a final decisionmaker have reached the decision. Yet, the Court cannot see why the same rationale would not apply here, as in the § 1983/1981 context. Both claims employ the same *McDonnell Douglas* test. Indeed, in *Mason v. Village of El Portal*, 240 F.3d 1337, 1339 (11th Cir.2001), the panel applied the *McDonnell Douglas* test to a § 1983 race claim and concluded that the plaintiff had not shown pretext, where she had merely shown that one member of a five-member council held a discriminatory motivation. It is difficult to understand why the same logic would not apply to a Title VII multi-member board situation.

█ The only analogy in the traditional, private employer Title VII case law occurs in the "cats-paw" cases. Specifically, even where an underling involved in the decisionmaking process operates under a tainted intent, this intent is not attributed to the final decisionmaker if the latter conducted his own evaluation and made a decision that was free of the subordinate's discriminatory animus. *See, e.g., Pennington v. Huntsville*, 261 F.3d 1262, 1270 (11th Cir.2001); *Wright v. Southland Corp.*, 187 F.3d 1287, 1304 n. 20 (11th Cir.1999); *Llampallas v. Mini–Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998).

█ While neither party has discussed the intention of the other Board members, the same evidence that underlies defendant's proffer of its non-discriminatory reasons likewise strongly supports an in-ference that the Board had strong racially neutral reasons for not wishing to have plaintiff assume the temporary role of Interim Director. As noted, a recent employee survey had shown strong employee dissatisfaction with plaintiff's leadership: a fact that would understandably weigh in the Board's consideration of an interim director, given the financial and morale pressures that the Center faced. While plaintiff disagrees with the defendants' interpretation of this survey, the Court concludes that defendant Board's interpretation is one that a reasonable employer could make. *Pennington*, 261 F.3d at 1267. Moreover, defendant was concerned about what it's members believed to be the surreptitious manner that plaintiff and Ashe had attempted to manipulate the selection of an interim director. Again, while plaintiff disagrees that there was any subterfuge, the Court concludes that a reasonable employer could draw that inference. Plaintiff also argues that, because defendant exaggerated Wiggins' duties in the defendants' statement to the EEOC, that defendant Board's stated reasons for picking Wiggins are not worthy of belief. Yet, even if somewhat exaggerated, if appears clear defendant had far more confidence in Wiggins' ability to lead the Center in the difficult times ahead, given Wiggins apparent even temper and longevity with the institution.

Moreover, it should also be noted that the only African–American member of the Board, Cecelia Owens, has testified that the Board's decision to appoint Wiggins, over plaintiff, was based on the merits, and not on racial discrimination. In particular, Owens has testified that the decision to select Wiggins as Interim Executive Di-

---

**38.** Ordinarily, a plaintiff pressing a § 1983 claim cannot hold a local government liable for the actions of its employees, absent a decision by a final decisionmaker, because § 1983 does not provide for liability under a theory of *respondeat superior*. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

rector was not based on racial animus by any of the CCCSB members, but instead was based on the Board's dissatisfaction with plaintiff's leadership abilities. (Owen Dep. at 56.) Specifically, Owens states that the Board rendered its decision to appoint Wiggins as Interim Executive Director because of the negative comments about plaintiff in the Employee Survey (*id.* at 32), the evidence that Collier fostered a negative "employee culture" in that "80 to 90 percent of the employees were saying that they were going to leave if she stayed there" (*id.* at 48), and the fact that such comments could not be "overlooked in terms of wiping out the organization" since they came from a "significant majority" of Center employees. (*Id.* at 50.) Owens did agree that Collier was well qualified for the position, but from Owens' background as a corporate executive, she understood "that it takes more [than qualifications] to get things done because even though [managers] make decisions from the top,

it's the people on down that have to carry out and have to ... get the job done." (*Id.* at 49.)[39]

Plaintiff discounts Owens' testimony, noting that Owens resigned a few months after the Wiggins' appointment, citing racial pressures. The Court agrees with plaintiff that Owens' resignation letter was quite emotional and indeed expressed frustration at the racial issues that had arisen at the Center,[40] albeit the letter never referenced specifically the Interim Director flap. In her deposition testimony, Owens explains that she is a "heart patient" and "the stress was getting to [her]" from being the only African–American CCCSB member, because many African–American employees at the Center came to her with their grievances. (Owen Dep. at 65–66.) Owens further claimed that she felt that she "was being silenced, so to speak, and not by a command but [by] every vote taken [because] it was a majori-

39. In her affidavit attached to plaintiff's brief in opposition to summary judgment, Collier claims that Owens' testimony "boarders on perjury" because plaintiff claims that "the survey results do not reveal a strong dissatisfaction with" her and Owens allegedly told plaintiff that the CCCSB was discriminating against her on the basis of race. (Collier Aff. ¶ 7.) As to her first assertion—that the survey results do not reveal a strong dissatisfaction with her—the Court has reviewed the survey results and concludes that a reasonable person could infer from them that a majority of Center employees were not satisfied with the current management. (*See* Discussion *supra* at n. 6; Employee Survey attached as Ex. A to Collier attached as Ex. L to Defs.' Br. In Opp. To Summ. J. [45].) For example, "management" ranked as the top complaint under the category entitled "greatest weaknesses of the organization" and "greatest source of frustration about the organization." (*Id.*) In addition, complaints about Collier in specific or management in general stood out as a common "write-in" complaint. (*Id.*)

With regard to any earlier statement by Owens to plaintiff expressing a belief that race had played a role in the Board's deci-

sion, as noted, Owens' own deposition testimony indicated that Collier's race did not play a role in the decision to hire Wiggins.

40. Owens' emotionally charged resignation letter states that:

Please be informed that I am official resigning my position with the Clayton CSB. Due to the illegal and unethical conduct of the Board, the racial discrimination that I have witnessed and also experienced, the inability of the Board to provide effective leadership ... have all formed me to make this decision.

May God have mercy on all of your souls. God is not slack concerning His promise, for whatsoever a man or woman soweth, that shall he or she also reap. Bob Reynolds, Debbie Hibbon, Jean Gissert, Crandle Bray and Mike McBroom GOD WILL DEAL WITH EACH OF YOU INDIVIDUALLY for the evil you have done and continue to do to our lives of so many people. THIS IS A PROPHETIC WORD TO EACH OF YOU! JUDGEMENT IS COMING.

*(See* Resignation Letter attached to Owens Dep.)

ty vote and I was the minority." (*Id.* at 66.)

Whatever may have motivated her resignation, however, or whatever she may have meant to convey in her letter of resignation, the fact is that, in her deposition testimony, Owens does explicitly indicate her belief that the interim director decision was made on the merits, and not as a result of racial motivations. Thus, taking the inferences in the light most favorable to plaintiff, it may be that, at one time, Owens may have expressed a belief that race played a role in the interim director decision, but, when it came down to swearing an oath on the matter, at a time when emotions had cooled, Owens ultimately acknowledged that the decision in question was made on the merits.

Further, two other facts bolster the defendant Board's stated reasons. First, as noted *supra,* plaintiff and Wiggins had been in competition initially for the Associate Director's position that plaintiff ultimately received. As the same Board that plaintiff now accuses of racial discrimination selected plaintiff over Wiggins originally, it seems more reasonable to infer that the Board made this choice because plaintiff had forfeited their confidence rather than to infer that the Board had suddenly become more bigoted.[41]

Second, although plaintiff's conduct after the Board's decision cannot supply a reason for that decision, it still bears repeating that plaintiff's outrageous conduct after the Board selected Wiggins

bolsters the Board's negative impression of her leadership abilities. As noted, defendant has provided the testimony of two witnesses to the effect that plaintiff orchestrated a walk-out of her entire management team in protest of the Board's decision to name Wiggins the interim director, and that she did so in an effort to bring the operations of the Center to a halt. Indeed, the circumstantial evidence supports this testimony, as plaintiff's entire team took FMLA leave immediately upon the Board's announcement and plaintiff, herself, stayed out of work for three months during this difficult time for the Center. Accordingly, on this record, the Board's prior impression of plaintiff's poor attitude[42] appears to have been completely vindicated.

For all the above reasons, the Court grants summary judgment to defendant Center Board on plaintiff's Title VII race discrimination claim.

## B. Individual Defendants Liability on § 1983/1981 Race Discrimination Claim[43]

### 1. *Members of the Board Other Than Reynolds*

As noted *supra,* plaintiff has offered no evidence that these other Board members operated under a discriminatory intent. Therefore, these members are entitled to summary judgment on the merits.

---

**41.** The Court is aware that this argument is not dispositive, as perhaps plaintiff might argue that a bigoted board might feel comfortable with an African–American in a second-in-command position, but not in the command position.

**42.** Plaintiff may have sincerely felt that the appointment of Wiggins was a mistake and even a racially motivated error. Yet, launching a mutiny by her staff at this precarious

time for the Center revealed plaintiff to have little concern for the agency or the vulnerable constituents that it served.

**43.** As noted in the Court's earlier Order regarding defendants' motions to dismiss, the individual plaintiffs cannot be held liable for any Title VII liability. *In Re: Employment Discrimination Litigation,* 198 F.3d 1305, 1309 n. 3 (11th Cir.1999).

## 2. *Bob Reynolds*

 As noted, plaintiff has arguably adduced some evidence that could suggest pretext on Reynolds' part for any role that he might have had in the Board's decision not to pick plaintiff for the interim job. As there has been no evidence that Reynolds' purported beliefs were ever expressed to, or influenced, the other members of the Board, plaintiff has failed to show any causal relation between Reynolds' alleged intent and the ultimate action of the Board. *Dixon v. Burke County*, 303 F.3d 1271, 1275–76 (11th Cir.2002) (individual member of grand jury not liable under § 1983 because there was no evidence of a causal connection between defendant's gender-motivated speech exhorting a particular decision and the ultimate decision of the entire body). For this reason, the Court concludes that summary judgment is appropriate for defendant Reynolds.

## IV. Plaintiff's Contention that Wiggins' Treatment of Her After Her Return to Work Constituted Constructive Discharge in Retaliation for Plaintiff's Title VII Protected Conduct

### A. *Potential Liability of Various Defendants on this Claim*

Plaintiff has contended that she was subjected to intolerable treatment upon her return to the Center and that this treatment was done in retaliation for her protected activity under Title VII. She argues that this retaliation resulted in an adverse action: to wit, her constructive discharge. As plaintiff makes this claim under Title VII, only her employer, the defendant Center, not its individual members nor Jimmy Wiggins, can be held liable. *See Smith v. Lomax*, 45 F.3d 402, 403 n. 4 (11th Cir.1995).

### B. *Standards for Showing Retaliation*

To make out a *prima facie* case of retaliation under Title VII, plaintiff must show that she "(1) engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; (2) was disadvantaged by an action of the employer simultaneously with or subsequent to such opposition or participation; and (3) that there is a causal connection between the protected activity and the adverse employment action." *Pennington v. Huntsville*, 261 F.3d 1262, 1266 (11th Cir.2001); *Morgan v. City of Jasper*, 959 F.2d 1542, 1547 (11th Cir.1992) (quoting *Whatley v. M.A.R.T.A.*, 632 F.2d 1325, 1328 (5th Cir. 1980)). Once the plaintiff makes a prima facie showing, the burden shifts to the defendant to present evidence that it had a legitimate, nondiscriminatory reason for terminating the plaintiff. *Pennington, supra.* If the defendant is able to put forth such a reason, the burden of going forward shifts again to the plaintiff, who must show that the reason put forth by defendant was a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. 1817. *See also Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir.1998); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir.1991) (footnote omitted); *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.1985).

### 1. Adverse Action—Was plaintiff constructively discharged?

Here, its is undisputed that plaintiff's filing of an EEOC charge in March of 2000, based on the selection of Wiggins as Interim Director, constituted protected activity. It is not clear, however, that plaintiff suffered an adverse action. Plaintiff argues that, even though she resigned her position, she was constructively discharged due to the removal of most of her previous duties, upon her return from "FMLA"

leave. Defendant Board disputes her contention that the conditions of her employment upon her return were so intolerable as to create an intolerable atmosphere that would prompt a reasonable person to quit. Accordingly, the Court must first determine whether plaintiff was constructively discharged.

Adverse employment actions are not limited strictly to ultimate employment decisions such as a termination or a failure to promote. *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.1998) ("Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions."). Nevertheless, Collier claims only that her responsibilities and prestige were lessened because following her return from extended leave she supervised approximately ten black employees in Utilities Management, although she is not sure of this number,[44] whereas before she had supervised approximately 280 to 300 employees. Collier suffered no reduction in pay or title. (Wiggins Dep. at 62; Collier Dep. at 171.) Moreover, Wiggins states Collier was selected to supervise Utilities Management due to her "clinical skills" and "prior managerial experience" because

federal funding for the Utilities Management program was expected to increase whereas funding for other areas at the Center had decreased. (Wiggins Dep. 66–67.) [45]

To determine whether a plaintiff can state a claim for constructive discharge based on an alleged adverse employment action, the Eleventh Circuit has instructed lower courts to use an objective test, asking whether "a reasonable person in [the plaintiff's] position would view the employment action in question as adverse." *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir.1998). *Cf., e.g., Eskra v. Provident Life & Accident Ins. Co.*, 125 F.3d 1406, 1412 (11th Cir.1997) (considering a reduction in income, but not mentioning the plaintiff's subjective preferences, in ruling that a transfer was adverse). "An employment action ... is not adverse merely because the employee dislikes it or disagrees with it." *Perryman v. West*, 949 F.Supp. 815, 819 (M.D.Ala.1996); *accord McCoy v. Macon Water Auth.*, 966 F.Supp. 1209,1220 (M.D.Ga.1997). Moreover, not "every unkind act" amounts to an adverse employment action. *Wu v. Thomas*, 996 F.2d 271, 273 n. 3 (11th Cir.1993) (per curiam).[46]

---

**44.** Collier states in her deposition that she is "not sure that she supervised [ten] to be absolutely truthful." (Collier Dep. at 176.)

**45.** Perhaps Collier's supervisory role would have increased had she remained at her job for longer than one month upon return from the extended leave. *See Garner v. Wal–Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987) (stating that a reasonable employee does not "assume the worst" and "jump to conclusions too fast" about an employer's motives.)

**46.** The Seventh Circuit, in particular, has repeatedly declared that "a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir.1996); *see also*

*Flaherty v. Gas Research Inst.*, 31 F.3d 451, 457 (7th Cir.1994); *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993); *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 885–86 (7th Cir.1989). "Otherwise, every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Williams*, 85 F.3d at 274. Thus, "not everything that makes an employee unhappy is an actionable adverse action." *See Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996). The *Williams* court also was concerned that, if purely lateral transfers were actionable, then "[t]he Equal Employment Opportunity Commission, already staggering under an avalanche of filings too heavy for it to cope with, would be crushed, and serious complaints would be lost among the trivial." *Williams*, 85 F.3d at 274.

 Collier does not claim any tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline. *Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232 (11th Cir.2001) (finding adverse employment action did not occur because no loss in benefits, ineligibility for promotional opportunities, or more formal discipline); *Jordan v. Wilson,* 851 F.2d 1290, 1292–93 (11th Cir.1988) (indicating that a term or condition of employment must be affected in order for there to be an adverse employment action.). *Compare Robertson v. Alabama Dept. of Economic and Community Affairs,* 902 F.Supp. 1473 (M.D.Ala.1995) (adverse action when plaintiff transferred from office building to warehouse, from position with supervisory function to one with *no* subordinates, and performance evaluation changed from high mark to "meets standards."). Although Collier may have been subjectively unhappy with her new responsibilities at the Center, she has failed to demonstrate that the change in her duties was objectively "adverse." Accordingly, the Court concludes that plaintiff faces an up-hill battle on her constructive discharge claim. Again, absent a constructive discharge, no adverse employment action occurred. Moreover, Collier cannot state a *prima facie* case of retaliation without a showing of an adverse action. Even to assume such an adverse action, however, plaintiff still loses on this claim.

## 2. Defendant has shown legitimate, non-discriminatory reasons for its treatment of plaintiff upon her return

 Even if plaintiff were constructively discharged,[47] the Court concludes that defendant Board has shown a non-discriminatory reason for its decision to reduce some of plaintiff's duties: specifically, the walk-out and mutiny that plaintiff had previously staged.[48] Alternatively, the undisputed evidence supports an argument that defendant would have made the same decision regarding plaintiff's duties, upon her return, even had she never filed the EEOC charge. In *Pennington v. Huntsville,* 261 F.3d 1262 (11th Cir.2001), the Eleventh Circuit held that, even after the 1991 Civil Rights Act, an employer's mixed-motive defense is still a defense to liability in a Title VII retaliation case. *Id.* at 1268–69. Accordingly, even where the record permits an inference that an employer's decision was motivated, in part, by a desire to retaliate, the employer may still be entitled to summary judgment if the record indicates that it would have made the same decision, notwithstanding a retaliatory motive. *Id.* Here, defendant argues that it had no choice but to give plaintiff somewhat reduced assignments given the fact that she had led an employee revolt for the sole purpose of disrupting operations and had walked out on her job for a three month period of time, thereby requiring defendant to reassign the duties previously performed by plaintiff and her team to other employees. Defendant has

---

**47.** For purposes of this analysis, the Court will assume that she has also presented evidence of a causal connection between her protected conduct and any constructive discharge.

**48.** The Court is aware that plaintiff may argue that she really was sick and that her team members really were sick. Yet, she has not specifically contradicted the testimony of

Hoobler and Wood, the two people who testified that plaintiff did in fact organize a "sick-out." Moreover, even were plaintiff telling the truth here—an assumption that appears totally belied by the record—defendant could rely on its good faith and reasonable belief that plaintiff had so acted. *Pennington v. City of Huntsville,* 261 F.3d 1262, 1267 (11th Cir. 2001).

noted its concern that it would have been unfair to these employees, who had been left in the lurch by plaintiff's actions, to reshuffle the assignments.[49] Further, given plaintiff's volatility and track record, defendant could not be sure how long she would stay on the job: a fear borne out by the fact that plaintiff did indeed quit a month after returning to her job. Had defendant returned plaintiff to her previous duties and had she walked out again, defendant's operations would have once again been disrupted by plaintiff's conduct. The Court concludes that defendant's valid concerns in this regard constitute a nondiscriminatory reason for its decision to reassign many of plaintiff's duties.[50] Stated another way, the Court concludes that the evidence indicate that defendant would have taken the same action, even had plaintiff never filed her EEOC charge.

## V. *Retaliation in Violation of the FMLA*

Initially, plaintiff had also couched her retaliation/constructive discharge claim as being retaliation for plaintiff's having taken leave for a serious health condition, pursuant to the Family Medical Leave Act (FMLA). Defendants have argued in their initial brief in support of motion for summary judgment that plaintiff can no longer make such a claim as the Eleventh Circuit has held that Eleventh Amendment immunity applies with regard to such FMLA claims. *See Garrett v. Univ. of Ala. at*

*Birmingham Bd. of Trs.*, 193 F.3d 1214, 1219 (11th Cir.1999), *rev'd on other grounds sub nom. Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (Supreme Court held that Eleventh Amendment immunity applies to claims made against States under the ADA). Plaintiff does not dispute this argument and appears to have abandoned her FMLA claims. Accordingly, the Court GRANTS summary judgment to defendants on this claim, as well.

## VI. *Defendants' Motion to Compel Medical Records*

Defendants have also petitioned this Court to compel production of Collier's medical records regarding care and treatment by Sacks, a licensed social worker. (*See* Mot. To Compel Med. Records [38].) Defendants contend that the documents produced by Sacks in response to the subpoena were redacted in two places (possibly others) at the request of plaintiff's counsel. (*Id.* at 3.) Therefore, defendants petition the Court to order the production of Collier's unredacted medical records from Sacks. (*Id.*) In the alternative, they ask the Court to conduct an incamera inspection of the unredacted medical records in order to ascertain whether the defendants are entitled to Collier's complete medical records from Sacks. (*Id.*) As the Court has granted defendants' Motion for Summary Judgment, the Court **DENIES**

---

**49.** As discussed *infra,* the Court notes that plaintiff is unable to proceed on her FMLA retaliation claim. Had she been able to do so, however, the Court is not clear that a desire by an employer not to upset employees who have been saddled with the work of an employee who has taken extended leave would constitute a legitimate reason under the FMLA for reducing the incumbent employee's duties. Indeed, the FMLA envisions and invites such a result, as presumably all but very large workplaces will generally be inconvenienced, and sometimes greatly so,

when an employee takes a three month period of leave. A concern for office morale, however, does not constitute an invalid reason for purposes of construing a retaliation claim under Title VII. Indeed, the typical Title VII retaliation claim does not involve a situation where an employee has taken an extended leave, thereby necessitating a reassignment of her duties.

**50.** Plaintiff has offered no evidence of pretext to discount this explanation.

as moot defendants' Motion to Compel Medical Records [38–1].

## VII. *Miscellaneous Motions*

Two additional motions are presently before the Court. On December 10, 2002, defendants filed a Motion For Leave To File a Brief that Exceeds the Page Limits established by the Local Rules [44–1]. On February 5, 2002, plaintiff filed a Motion for Leave to File a Brief that Exceeds the Page Limits established by the Local Rules [53–1]. In recognition of the fact that the issues involved in this case are numerous and complex, the Court **GRANTS** both motions to exceed the page limitation imposed by the Local Rules. Both documents filed in conjunction with the motion to exceed pages were considered in rendering the Order.

## *CONCLUSION*

For the foregoing reasons, the Court **GRANTS** defendants' Motion for Summary Judgment [45]; **DENIES as moot** defendants' motion to compel the production of plaintiff's medical records [38–1]; **GRANTS** defendants' motion to file a brief in excess of pages [44]; **GRANTS** plaintiff's motion to exceed page limitation [53–1]; and **GRANTS** defendants' motion to extend time to file a reply brief [56–1].